1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSEPH DAVID CHAPA,                          No.  2:16-cv-2019 JAM AC P

12                  Petitioner,

13         v.                                     FINDINGS AND RECOMMENDATIONS

14   JOE A. LIZARRAGA, Warden,

15                  Respondent.

16

17         Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed in this

19   court on August 24, 2016,[1] ECF No. 1, which challenges petitioner's 2012 conviction for sex

20   offenses against children.  Respondent has answered, ECF No. 11, and petitioner filed a traverse,

21   ECF No. 14.

22                                    BACKGROUND

23    I.      Proceedings In the Trial Court

24         A.  Preliminary Proceedings

25         Petitioner was charged in Sacramento County with three counts of lewd touching (Cal.

26

27   ---

   [1] Because the timeliness of the petition is not disputed, the court need not consider application of
   the prison mailbox rule.  See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a
   prisoner's court document is deemed filed on the date the prisoner delivered the document to
28   prison officials for mailing).

                                         1

Penal Code § 288(a)) committed between December 2005 and October 2007, against victim Jeremy, a child under age 14 (Counts 1, 2, and 3); two counts of oral copulation (§ 288a(b)(2)) between an adult over age 21 and Jeremy, a child under age 16, between October 2006 and July 2009 (Counts 4 and 5); sodomy (§ 286(b)(2)) committed against Jeremy between 2007 and 2009 (Count 6); lewd touching committed between January 2008 and December 2008, against victim Manuel, a child under age 14 (Count 7); and oral copulation with Manuel between January 2009 and December 2009 (Count 8).  The pleading alleged an enhancement for multiple victims under section 667.61, subdivision (e).  CT 138-142 (Second Amended Information).[2]

Petitioner pleaded not guilty, and the case proceeded to jury trial.

B.  The Evidence Presented At Trial

Evidence of the following facts was presented to the jury.[3]  In 2005, petitioner lived in a mobile home park with his elderly mother and his long-term boyfriend, Richard Comer, whom petitioner initially introduced as his brother.  The victims lived in the same mobile home park. Jeremy lived with his mother (who was in poor health), three brothers, and a sister.  Manuel lived with his mother, who worked outside the home, and his brothers.  The victims were not friends. Jeremy was 11 years old when he met petitioner and 18 years old when he testified at trial. Manuel was seven or eight years old when he met petitioner and 16 years old when he testified at trial.

Jeremy and Manuel performed yard work and other chores for which they were paid by petitioner and Comer.  Each boy spent increasing amounts of time at petitioner's home, sometimes days, and grew to consider petitioner as a father figure and Comer like an uncle. Petitioner and Comer paid for the boys' cell phone service and gave them gifts, including clothes, shoes, a television, computer, stereo, iPod, and Xbox.  The Xbox was kept at petitioner's home, in the master bedroom, where the boys played it.  Petitioner and Comer also took the boys out to eat

---

[2]  "CT" refers to the Clerk's Transcript on Appeal, Lodged Doc. 1.  "RT" refers to the Reporter's Transcript on Appeal, Vols. I through IV, Lodged Docs. 3-6.

[3]  This statement is adapted from the opinion of the California Court of Appeal for the Third Appellate District, Lodged Doc. 10.  The undersigned has independently reviewed the trial transcripts and finds the summary to be accurate.

1   and took them on trips.  Petitioner did not work and got his money from Comer, who had

2   inherited money when his mother died.  Each boy testified that Comer never touched him

3   inappropriately.

4         In 2005 or 2006, when Jeremy was 12 or 13 years old and was alone with petitioner,

5   petitioner touched Jeremy's leg, rubbed Jeremy's penis over clothing, and took Jeremy's hand

6   and rubbed it over petitioner's clothed penis.  Petitioner said it was okay and had happened to him

7   when he was young.  On a later occasion and many occasions thereafter, petitioner had Jeremy

8   orally copulate him as "a favor."  Jeremy sometimes told petitioner he did not want to engage in

9   oral copulation, but petitioner got angry and cursed and threatened to stop being Jeremy's

10  friend.  When Jeremy protested during a trip to Santa Cruz, petitioner convinced him

11  by saying, "You can do something for me since I brought you all the way out here."

12  When petitioner developed a urinary tract infection, he had Jeremy put his penis in petitioner's

13  anus.  A few times, petitioner told Jeremy not to tell anyone because nobody would believe him.

14        One day, when Jeremy was 12 or 13 years old, petitioner pulled a bag out from under

15  the bed and displayed sex toys (dildos) and lubricant.  Comer was there and said petitioner should

16  not be showing Jeremy the items.  Another day, before watching a movie, petitioner removed a

17  DVD from the player and said Jeremy could not watch it because it was X-rated "gay porn."

18  Petitioner then placed the DVD with others in a cubbyhole within easy access.

19        Around Father's Day 2009, Jeremy told petitioner he did not want to do anything sexual

20  anymore.  Around the same time, Jeremy and petitioner got into a fight because petitioner

21  objected to Comer renewing Jeremy's cell phone contract.  Petitioner became mean, stopped

22  buying things for Jeremy, and stopped taking him places.  Jeremy grew "tired of holding it in"

23  and disclosed the sex abuse to Comer, then to his (Jeremy's) mother, who called the police.

24        Manuel testified he was age seven or eight when he started doing chores and spending

25  time at petitioner's home.  Manuel developed a relationship with petitioner's elderly

26  mother.  When he was 10 or 11, he started helping her care for herself, because she complained

27  her son would let her sit in her own filth.  The inappropriate touching started when he was nine or

28  10 years old; petitioner fondled Manuel's penis and masturbated him.  Petitioner said, "It's okay,

3

1  I love you."  When Manuel "got comfortable" with that activity at age 10 or 11, petitioner began

2  orally copulating him regularly.

3         Petitioner got angry when Manuel said he did not want to do it anymore.  Manuel

4  was afraid to tell his mother.  Petitioner never threatened him but did say that Manuel should not

5  tell anyone.

6         The last incident of oral copulation occurred on September 12, 2009, when Manuel

7  was 14.  On that day, Manuel's mother learned of Jeremy's accusations against petitioner, asked

8  her son, learned he had also been abused, and called police, who sent Manuel for a medical

9  examination.

10         Manuel went to stay with his father in Utah for a few months.  When he returned,

11  petitioner was in jail.  Manuel visited Comer, who said he did not believe the accusations and did

12  not want petitioner to be in trouble.  Manuel felt bad for petitioner.  At Comer's urging and with

13  Comer telling him what to write, Manuel wrote a letter to former defense counsel, stating "I ...

14  was not telling the truth.  Because I felt really pressured by everyone around me because I was

15  moving to Utah because my mom called my dad and asked him if he wanted to raise me [until] I

16  was [18] years of age.  But [petitioner] did not do anything to me at all and I lied because

17  I was mad!!"  After his signature, Manuel added, "I'm sorry I lied about [petitioner]."  At trial,

18  Manuel testified the letter was a lie.  He felt pressured by Comer to write the letter, and at the

19  time Manuel felt bad for getting petitioner in trouble because petitioner had been like a father to

20  Manuel.

21         A criminalist found DNA consistent with petitioner's DNA profile in swabs from

22  Manuel's genitals.  The swabs from Manuel's genitals also showed moderate levels of amylase,

23  which might indicate saliva, though saliva has higher levels of amylase.  A police search of

24  petitioner's home revealed a bag of sex toys and pornographic DVDs.  On cross-examination of

25  the police detective who provided the affidavit for the search warrant, the defense elicited that no

26  child pornography was found on defendant's computer, contrary to the profile for child molesters.

27  On redirect examination, the prosecutor tried to ask the detective about child molesters

28  ////

1   "grooming" victims but gave up in the face of defense objections that the witness was

2   not qualified.

3       The next witness was clinical psychologist, Dr. Anthony Urquiza, who testified about the

4   use of Child Sexual Abuse Accommodation Syndrome (CSAAS) to dispel misconceptions about

5   how a sexually abused child should act.  After establishing Dr. Urquiza's credentials, the

6   prosecutor asked him about "grooming."  The doctor testified as follows:

> The simplest way to explain it is rather than think about sexual abuse as an act, it's better to think about it as behaviors that occur as a part of a relationship between a child and an adult.  Sexual abuse is really best described as a relationship.  And we know from research, both from children and from adults who are perpetrators and children who have been sexually abused, that there are a number of behaviors that occur prior to actual sexually inappropriate behavior.  That is, kids are—the phrase is groomed, but they are desensitized or prepared for being sexually abused as a part of that relationship, often by some very innocuous types of things.  So, for example, it's a process of gradually increasing the amount of sexualized material or affection or behavior into the relationship before you actually sexually abuse the child.

> One example would be children, before they get abused, may have established a warm, friendly, comfortable enjoyable relationship with the perpetrator.  That may actually step a little further by being in a relationship in which there's a lot of physical affection.  Not sexual abuse, just a lot of touching, lot of hugging, lot of putting your back [sic] on the shoulder, lots of things to get kids comfortable with the notion of being physically touched ... by the perpetrator.

> Maybe even a step more towards physically touching in places that are not common for kids, touching on the bottom, touching on the back, or maybe sometimes touching on the stomach or chest or breasts. Maybe even introducing some direct sexualized material.

21      The prosecutor asked whether introducing sex toys to a child would constitute grooming.

22   The expert said, "Certainly.  I mean, it wouldn't start out that way.  It would start out with—or it's

23   not likely to start that way.  It would start out with maybe X-rated magazines or Playboy

24   magazines or maybe R-rated movies, and then it would graduate.  So the process is to make the

25   child feel more comfortable with what would eventually be sexually inappropriate material or

26   behavior.  Because you can't just walk up to a child and—it's difficult to walk up to a child and

27   engage in direct sexual activity.  But you can get them used to that topic, used to that behavior,

28   used to that material by taking it in smaller incremental steps."

5

1          The prosecutor then asked Dr. Urquiza to explain CSAAS and the five categories of

2    secrecy, helplessness, entrapment/accommodation, delayed/unconvincing disclosure, and

3    retraction.  Whereas people assume a molested child will sound an alarm, minors molested by

4    someone they know may keep it a secret because they have a relationship with the perpetrator and

5    have been coerced to keep quiet or have received gifts or affection they do not want to lose.

6    Whereas people often assume an abused child will scream or run, an ongoing relationship with a

7    bigger, stronger person can leave a child feeling helpless.  Accommodation refers to how children

8    cope with being abused, such as dissociating from the experience as it happens.  Whereas one

9    might expect a child to report sexual abuse right away, abused children may delay reporting out

10   of embarrassment or fear they might cause trouble for themselves or the abuser, and they may

11   make inconsistent statements where abuse has occurred over a period of time.  An abused child

12   will sometimes succumb to pressure to recant the accusation.

13         The expert acknowledged CSAAS assumes abuse has occurred; it is not used to determine

14   whether or not abuse has occurred.  Dr. Urquiza had not spoken with petitioner or his accusers,

15   had not reviewed any documents in this case, and had no opinion whether the allegations were

16   true or false.

17         On cross-examination, Dr. Urquiza acknowledged CSAAS does not address false

18   allegations of child sexual abuse; he had not done any research on false allegations; and it would

19   be inappropriate for him to opine whether a particular child was lying.

20         On redirect examination, the prosecutor asked the expert about empirical studies regarding

21   false allegations.  The expert began with a caveat, that it was a very difficult matter to research.

22   He then said that 12 to 15 research studies had been done and indicated that one to six percent of

23   allegations had been determined to be false by researchers or by admission.  One Canadian study

24   in 2009 looked at 795 accusations and found about four percent were determined to have been

25   false, and in those cases the accusations were made by a parent, not the child.  The doctor

26   concluded, "So my opinion is ... false allegations of sexual abuse do happen, but they happen very

27   infrequently or rarely."

28   ////

On recross-examination, defense counsel asked how those studies determined whether allegations were false.  Dr. Urquiza replied, "Usually they identify a population of children who have made the claim that they were sexually abused, do a follow-up investigation to identify which of those cases were determined by them, the researchers, to have been a false allegation, and sometimes the child or the family member themselves will acknowledge that it was a false allegation, and sometimes it was made by the researchers.  And there was a degree of tentativeness, which is why I started off with a caveat that, you know, this is a tough area to do research on."

Petitioner did not testify. The defense theory was that the boys were lying, perhaps to get back at petitioner for ending his generosity, or to blame someone else for their own behavioral problems.  The defense explored inconsistencies between the victims' trial testimony and previous statements to police, e.g., as to when, where, and how often the inappropriate touching occurred, and failure to mention anal sex in initial reports.  Petitioner presented neighbors and his housekeeper as character witnesses that he was a kind and generous person.  Petitioner's mother testified Manuel did not help her with "filth" but helped give her injections.  Police officers testified Jeremy made unnecessary 911 calls in 2004 and 2007 about fights with his brothers.  Social workers testified to routine interviews in 2004, before Jeremy met petitioner, and a 2006 interview—all unrelated to this case and unrelated to any sexual abuse—in which Jeremy was asked a standard question about sex abuse and said he had not been touched and would report it if it happened.

C.  Outcome

The jury found defendant guilty on all counts and found true the allegation of multiple victims.

The trial court sentenced defendant to a total indeterminate term of 30 years to life plus a determinate term of 12 years and eight months as follows: Consecutive terms of 15 years to life on Counts 1 and 7 due to multiple victims; eight years consecutive for Count 2, two years consecutive for Count 3, and eight months consecutive for Counts 4, 5, 6, and 8.

////

7

1    II.    Post-Conviction Proceedings

2         Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

3    conviction on February 19, 2015.  Lodged Doc. 10.  The California Supreme Court denied review

4    on May 20, 2015.  Lodged Doc. 12.

5         Petitioner did not seek habeas relief in state court.

6              STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

7         28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

8    1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16        The statute applies whenever the state court has denied a federal claim on its merits,

17   whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

18   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

19   absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

20   489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

21   decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

22   may be overcome when there is reason to think some other explanation for the state court's

23   decision is more likely."  Id. at 99-100.

24        The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

25   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

26   U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

27   Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

28   ////

8

issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 563 U.S. at 102.

DISCUSSION

I.     Claim One: Admission of Expert Testimony Violated Due Process

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that his right to due process was violated by Dr. Urquiza's testimony about (1) the infrequency of false allegations of child sexual abuse, and (2) how abusers typically engage in "grooming" activities.

1.  Infrequency of False Allegations

Prior to trial, the prosecution moved in limine for an order allowing the testimony of Dr.

Anthony Urquiza on the subject of Child Sexual Abuse Accommodation Syndrome.  Specifically, the prosecution asked the court to allow Dr. Urquiza to provide expert testimony to the jury relating to "delayed disclosure, entrapment, helplessness, and the secrecy aspect" of CSAAS.  CT 86.

In its written points and authorities in opposition, petitioner argued that the prosecution was required to "articulate the specific myth or misconception which the expert is expected to disabuse the jury about; and must tailor the expert's testimony to address this myth or misconception."  CT 96-97.  The defense went on to argue that the "prosecution should be prevented from eliciting testimony outside of this particularized area, including areas such as this witness's opinion of frequency, in general, of false allegations."  CT 97.

Prior to jury selection, the court took up these arguments. The defense reiterated its claim that the prosecution was required to identify "a misconception or myth that Dr. Urquiza is trying to clarify with the jury." 1 RT 38.  The prosecutor responded that Dr. Urquiza would explain why "delayed disclosure is common, and the reason it's common is because of the entrapment, helplessness and secrecy aspects of the syndrome." 1 RT 39.  During oral argument, neither party specifically addressed the admissibility or exclusion of testimony relating to false accusations of sexual abuse.  See generally, 1 RT 37-42.

The trial court allowed the expert testimony on CSAAS, noting that it would address "the misconception that a victim would want - - immediately report, a victim would tell someone versus keep it a secret, and a victim would not cooperate versus sort of accommodate to the situation. . ." 1 RT 40.  The judge stated it was "very clear that Dr. Urquiza is not to testify about whether abuse occurred in this case."  Id.  Asked by the defense to clarify its ruling, the court added that the purpose of Dr. Urquiza's testimony was "to address the misconceptions. . . out there, people thinking that molest victims would immediately report.  He's going to talk about delayed reporting, is my understanding, that molest victims would tell someone versus keeping it secret. . . [and] the issue of accommodation." 1 RT 41.

On direct examination of Dr. Urquiza, the issue of false allegations did not arise.  During cross-examination by the defense, the following testimony was elicited:

10

Q. And you haven't done any research in the area of false allegations, right?

A. I have not.

Q. Okay, and you have never met Jeremy, who has made false allegations in this case, right?

[Prosecutor] Objection, misstates the testimony and the evidence.

[The Court] Sustained.

Q. You haven't met Jeremy who may have made false allegations in this case, right?

A. I've met no one related to this case.

Q. Okay. And that would be the same for Manuel, the other one, right?

A. I would agree with that.

Q. You haven't read any of the police reports in this case?

A. Correct.

Q. Okay. You haven't reviewed any of the many statements that these young men have made?"

A. I have met no one, and I have reviewed no documents related to this case.

Q. Okay. So certainly you don't know if these young men are credible witnesses, right?

A. I know of no information about this case.

Q. You will not say that their allegations are true?

A. It would be inappropriate for me to have an opinion as to whether the allegations are true or not, whether somebody was abused or not, or whether somebody was guilty or innocent.

Q. And you don't know whether Jeremy or Manuel would be capable of lying?

A. I have no information about this case, so I can't provide you an opinion as to that.

3 RT 685-686.

The prosecution did not object to this line of cross-examination.

On re-direct examination, the prosecution elicited the following from Dr. Urquiza:

Q. [The defense attorney] asked you about false allegations. Are you familiar with research that [has] conducted empirical studies on false allegations?

A. Yes.

Q. And what has that research found?

A. Well, there's a caveat. I can tell you what the research found, but there's a caveat which is important to say, which is the area of child sexual abuse is really hard to do research on. You're doing research with children and dealing with research that is often kept secret, or they don't want to talk about, dealing with abuse, dealing with sexuality. It's a tough area to do research.

In addition to that, if you're doing research on false allegations of sexual abuse, I think it's even more difficult. So it's as important to recognize that the difficulty in being able to do research and what the data has to say with regard to false allegations. I always say that, and I think it's important.

Given that, there are probably about 12 to 15 research studies on false allegations made by children related to child sexual abuse. And what I typically say is that it is very infrequent or rare, given the data that we have, that a child would make an allegation of sexual abuse that was identified as being false. Does it happen? Certainly. But the data seems to show that it's somewhere in the range of about one to six percent of kids who have been abused - - or I'm sorry, who have not been abused and come to the attention of law enforcement, make an allegation that is, at some point later on, determined to be false.

I made note of probably one of the best studies, it's a Canadian study 2009 that looked at about 795 kids, or something like that. And what they found was about four percent of those allegations were deemed to have been false, somewhere in that one to six percent range.

What they also found is [that] in none of those four percent . . . cases was it the child who made the allegation that was determined to be false. It was somebody else involved in the case, parent, stepparent, somebody else like that, not the child who made the allegation. So my opinion is sexual - - false allegations of sexual abuse do happen, but they happen very infrequently or rarely.

3 RT 686-688.

2. "Grooming" of Victims

The prosecution's motion in limine specified that the CSAAS evidence would address common misconceptions about child sex abuse related to issues "that are present in this case such as grooming, delayed reporting, secrecy, helplessness and accommodation." CT 86. In announcing its ruling allowing the CSAAS evidence, the trial court stated that it would allow

12

1   evidence of grooming because it is not common knowledge.  1 RT 41.  Petitioner protested that

2   grooming was not one of the five misconceptions addressed by CSAAS (secrecy,

3   entrapment/accommodation, delayed disclosure, helplessness, and retraction).  The prosecutor

4   argued that grooming explained why children accommodate the abuser, "because the person has

5   groomed them to trust them, to say I'm your friend and you should rely on me because we have

6   this relationship.  So grooming as an aspect of those factors, that's how it's incorporated in all of

7   those."  Id.  The trial court concluded that the grooming evidence was relevant to the CSAAS

8   factors of delayed reporting, secrecy, and accommodation.  Id.

9                     B.   The Clearly Established Federal Law

10         The admission of evidence is governed by state law, and habeas relief does not lie for

11  errors of state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  The erroneous admission of

12  evidence violates due process, and thus supports federal habeas relief, only when it results in the

13  denial of a fundamentally fair trial.  Id. at 72.  The Supreme Court has rejected the argument that

14  due process necessarily requires the exclusion of prejudicial or unreliable evidence.  See Spencer

15  v. Texas, 385 U.S. 554, 563-564 (1967); Perry v. New Hampshire, 565 U.S. 228, 245 (2012).

16                    C.   The State Court's Ruling

17         This claim was exhausted on direct appeal.  Because the California Supreme Court denied

18  discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

19  decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

20  501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

21                  1.   Infrequency of False Allegations

22         The Court of Appeals found as follows regarding the trial court's resolution of the in

23  limine motion to permit Dr. Urquiza's testimony:

24              By oversight or otherwise, the parties did not argue, and the trial
            court did not rule, specifically as to the admissibility of testimony
25              relating to false accusations of sexual molestation by minors in
            general. A reasonable reading of the proceedings in the trial court
26              allows one to conclude that the court excluded, at most, testimony by
            Dr. Urquiza that he thought the minors in this case were not making
27              false accusations, thus leading to the conclusion that the defendant
            was guilty of the crimes alleged against him.
28

Lodged Doc. 10 at 10.

Regarding the parties' questioning of Dr. Urquiza about false accusations, the Court of Appeal stated, "It is significant to note that neither party objected when this line of questioning was pursued by the other." Lodged Doc. 10 at 13.

The claim of error was then evaluated as follows:

> As one can see from the record, other than a passing reference to false accusation evidence in defendant's written points and authorities in opposition to the People's motion in limine, there is no mention of the matter further and certainly no express mention of that subject in the court's ruling regarding limitations on Dr. Urquiza's testimony. We take the court's order – "Dr. Urquiza is not to testify about whether abuse occurred in this case" - to simply mean that Dr. Urquiza could not render an opinion that the victims in this case were sexually abused.

> Also, defendant first broached the subject of false accusations with Dr. Urquiza, strongly suggesting that defendant did not believe the subject had been ruled inadmissible by the court's earlier order. Moreover, defendant did not object when the prosecution followed the suggestion of false accusations by, quite understandably, eliciting testimony as to the frequency of false accusations in child sexual abuse cases generally, further strongly suggesting that the defendant's attorney did not find the People's questions on redirect examination improper.

> While it is correct that Dr. Urquiza's testimony on redirect examination provided the jury with relevant information bearing on the defendant's guilt, so did all of the rest of Dr. Urquiza's testimony and, indeed, so did the testimony of all of the prosecution witnesses. Dr. Urquiza did not give an opinion that abuse had occurred in this case; he went to some lengths to make sure the jury knew he was not doing so. There was no prosecutorial misconduct. There was no error.

Lodged Doc. 10 at 13.

### 2. "Grooming" of Victims

Regarding testimony about grooming, the Court of Appeal reasoned as follows:

> The trial court's decision to admit the testimony will not be disturbed on appeal unless a manifest abuse of discretion is shown. (People v. McAlpin (1991) 53 Cal.3d 1289, 1299 (McAlpin).)

> On appeal, neither side cites any authority regarding "grooming" evidence.

> Generally, "profile" evidence is a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged

14

in a specific illegal activity. (<u>People v. Robbie</u> (2001) 92 Cal.App.4th 1075, 1084 (<u>Robbie</u>) [rapist profile].) Profile evidence is generally inadmissible to prove guilt because of its potential for including innocent persons as well as the guilty. (<u>Id.</u> at pp. 1084-1085.) "[P]rofile evidence is inherently prejudicial because it requires the jury to accept an erroneous starting point in its consideration of the evidence. We illustrate the problem by examining the syllogism underlying profile evidence: criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal. Guilt flows ineluctably from the major premise through the minor one to the conclusion. The problem is the major premise is faulty. It implies that criminals, and only criminals, act in a given way. In fact, certain behavior may be consistent with both innocent and illegal behavior . . . ." (<u>Id.</u> at p. 1085.)

<u>Robbie</u>, <u>supra</u>, 92 Cal.App.4th 1075, held the trial court erred in allowing a law enforcement officer to testify as an expert in the behavior and conduct of rapists, i.e., that not all rapes involve violence or injury, and it is common for rapists to engage in small talk with their victims or acquiesce in a victim's request not to have sexual intercourse and to negotiate with her regarding other sex acts. (<u>Id.</u> at p. 1082.) The questions were put to the expert as hypothetical questions but mirrored the trial evidence. (<u>Id.</u> at p. 1084.) The expert admitted the described conduct was also consistent with consensual activity. (<u>Id.</u> at p. 1083.) <u>Robbie</u> rejected the Attorney General's argument that the evidence was admissible to disabuse the jury of misconceptions about rapists. (<u>Id.</u> at pp. 1085-1086.)

Here, there was no law enforcement testimony about grooming as a characteristic of child molesters. Instead, the defense used the police detective to say defendant did not fit certain characteristics of child molesters (computer storage of child pornography) and successfully prevented the prosecutor from using the detective for evidence of grooming as profile characteristics of child molesters. Dr. Urquiza's testimony about grooming explained how a child victim might come to tolerate improper touching by an adult perpetrator, but that would apply only if child molestation actually occurred. The doctor did not opine that grooming behavior was a characteristic of child molesters. The grooming evidence was relevant to rebut the inference that the defense hoped the jury would draw, i.e., that an abused child would not accommodate the abuse by continuing to visit the abuser, as the minors did in this case. The grooming testimony was not presented in a manner that urged the jury to find defendant guilty because he fit a profile of a typical child molester. There was no error in admitting the evidence.

Even assuming for the sake of argument that the evidence should have been excluded, defendant fails to show prejudice warranting reversal. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional <u>Watson</u> test [<u>People v. Watson</u> (1956) 46 Cal.2d 818, 836]: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]" (<u>People v. Partida</u> (2005) 37 Cal.4th 428, 439.)

15

> Defendant presents no prejudice analysis specific to the grooming evidence but simply refers to his perception that the prosecution's case was weak and asserts that, even if this error is not prejudicial, the cumulative effect of all errors is prejudice.
>
> The grooming evidence does not warrant reversal.

Lodged Doc. 10 at 14-16.

### D. Objective Reasonableness Under § 2254(d)

The Court of Appeal's resolution of the evidentiary issue was based on California law, and as such may not be revisited here. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (explaining that federal habeas corpus relief does not lie for errors of state law); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (explaining that a federal habeas court is bound by a state court's interpretation of state law). The only question cognizable in this court is whether admission of the testimony rendered the trial fundamentally unfair. Estelle, 502 U.S. at 70.

The state court did not expressly address that question. Finding no error, the Court of Appeals had no need to discuss the due process dimension of the dual challenge to CSAAS expert testimony. The undersigned notes that it was perfectly reasonable for the appellate court to find that the trial court's in limine ruling on the false accusation issue prohibited only expert opinion testimony as to Jeremy and Manuel's credibility, or as to petitioner's guilt. The transcript readily supports that interpretation. Also, it is quite true that the false allegation testimony was introduced at trial by the defense. Regarding the grooming issue, it was not unreasonable for the Court of Appeal to distinguish Dr. Urquiza's testimony from the offender profile testimony that California law prohibits (on grounds that suggest due process concerns). These considerations support the state court's ruling on the state law matter; they also weigh against any finding of fundamental unfairness as a due process matter.

The undersigned is troubled by the jury's exposure in this case to expert testimony regarding false accusation rates. It is axiomatic that a defendant must be tried on the exclusive basis of evidence relevant to his own conduct, and that witness credibility must be evaluated on the exclusive basis of factors pertinent to the specific witness. A jury informed by a child sexual abuse expert that children rarely make false accusations of sexual abuse cannot be expected to be

16

1    set that information aside when evaluating the credibility of particular child witnesses, or when

2    evaluating a defendants' guilt or innocence.  For these reasons, Dr. Urquiza's testimony is highly

3    problematic.  This court's qualms about the matter do not help petitioner, however.

4         Even if expert testimony about false accusation rates and/or grooming was improper, and

5    even if that impropriety had federal constitutional implications, federal habeas relief is

6    unavailable under AEDPA absent a threshold showing that the state court's rejection of the claim

7    constituted an objectively unreasonable application of clearly established U.S. Supreme Court

8    precedent.  The U.S. Supreme Court has never held that due process is violated by admission of

9    expert testimony about CSAAS generally, rates of false accusations in child sex abuse cases, or

10   the phenomenon of predatory "grooming."  Indeed, the U.S. Supreme Court has never held that

11   due process is offended in any context by prejudicial, even inflammatory, expert testimony or any

12   other kind of evidence.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (recognizing

13   that the Supreme Court has never held that the admission of any type of evidence violates due

14   process).  Absent a holding of the Supreme Court that governs the question, petitioner cannot

15   qualify for the narrow exception to AEDPA's bar to relief.  Wright v. Van Patten, 552 U.S. 120,

16   125-26 (2008) (per curiam).  Because there is no such governing precedent, this claim cannot

17   succeed.

18        Moreover, the California Court of Appeal did not unreasonably apply general due process

19   principles in rejecting this claim.  Fundamental fairness is the touchstone of due process; the

20   erroneous admission of even highly improper evidence violates due process only if the trial is

21   rendered fundamentally unfair.  Estelle, 502 U.S. at 72.  Here, the defense introduced the

22   testimony regarding false accusation rates.  The defense had a full opportunity, which it used

23   effectively, to test the entirety of Dr. Urquiza's testimony, explore its limits, and argue its

24   limitations.  Regarding all aspects of the CSAAS testimony, the jury was clearly informed that the

25   syndrome explains the behavior of children who have been abused but cannot be used to

26   determine whether a child has been abused.  The weight of the evidence against petitioner was

27   overwhelming without reference to Dr. Urquiza's testimony.

28   ////

In light of the trial record as a whole, even considering the undersigned's reservations about the propriety of the false accusation testimony, it was not objectively unreasonable of the Court of Appeal to summarily reject petitioner's due process theory.  Indeed, as explained above, the absence of a clearly-established rule on the question necessarily defeats the claim.  For these reasons, § 2254(d) bars relief in this court.

II.     Claim Two: The Jury Instruction Regarding Use of CSAAS Evidence Violated Due Process

      A.  Petitioner's Allegations and Pertinent State Court Record

The jury was instructed pursuant to CALCRIM 1193 as follows:

> You have heard testimony from Anthony Urquiza regarding child sexual abuse accommodation syndrome.
>
> Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.
>
> You may consider this evidence only in deciding whether or not Jeremy's and/or Manuel's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony.

CT 213.

Petitioner alleges that this instruction, given in conjunction with the standard witness credibility instruction, violated due process by undermining the presumption of innocence and reducing the prosecution's burden of proof.  The general instruction regarding witness credibility, pursuant to CALCRIM 226, included the following language: "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."  CT 204.

      B.  The Clearly Established Federal Law

Error in instructing a jury violates due process only where the infirm instruction so infects the entire trial that the resulting conviction violates due process.  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  It must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some constitutional right.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  The

18

1  challenged instruction may not be judged in artificial isolation, but must be considered in the

2  context of the instructions as a whole and the trial record overall.  Estelle, 502 U.S. at 72.

3  Moreover, relief is only available if there is a reasonable likelihood that the jury has applied the

4  challenged instruction in a way that violates the Constitution.  Id. at 72-73.

5      The Constitution requires the prosecution in a criminal case to prove each and every

6  element of the crime charged beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364

7  (1970).

8          C.  The State Court's Ruling

9      The opinion of the California Court of Appeal constitutes the last reasoned decision on the

10  merits, and is therefore the subject of habeas review in this court.  See Ortiz, 704 F.3d at 1034.

11  The Court of Appeal evaluated the claim as follows:

12  
13  
14  
> Defendant argues CALCRIM No. 1193 did not satisfy the trial court's sua sponte duty to give an appropriate cautionary instruction on the use of CSAAS evidence. Assuming the issue is preserved for appeal, the contention fails.

15  
16  
17  
18  
19  
> As indicated, the trial court instructed the jury with CALCRIM No. 1193: "You have heard testimony from Anthony Urquiza regarding child sexual abuse accommodation syndrome. [¶] Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jeremy's and/or Manuel's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." (Italics added.)

20  
21  
22  
23  
> Defendant notes the predecessor instruction, CALJIC No. 10.64, did not include the phrase about "evaluating the believability" of the victims. Defendant claims this phrase violates the legal principle that CSAAS evidence may not be used to determine the victim is telling the truth or to corroborate the victim's claims. Defendant maintains the instruction allowed the jury to use CSAAS evidence to corroborate the victims, reducing the prosecution's burden.

24  
25  
26  
27  
> However, the phrase challenged by defendant was a correct statement of law. CSAAS evidence is properly used to help the jury evaluate the credibility, i.e., believability, of the child's testimony. (McAlpin, supra, 53 Cal.3d at p. 1300 [CSAAS evidence is admissible to "rehabilitate such witness's credibility" when the defense suggests the child's conduct is inconsistent with the claim of molestation].)

28  

19

1

2

3

4

A defendant challenging an instruction as being subject to an erroneous interpretation by the jury must demonstrate a reasonable likelihood the jury understood the instruction in the manner asserted by the defendant. (<u>People v. Cross</u> (2008) 45 Cal.4th 58, 67-68.) In our de novo review, we determine the correctness of jury instructions from the entire set of instructions, not just an isolated part of an instruction. (<u>People v. Wallace</u> (2008) 44 Cal.4th 1032, 1075.)

5

6

7

8

9

Here, defendant is isolating a single phrase and ignoring the rest. CALCRIM No. 1193 as a whole told the jurors they could not use CSAAS evidence to find defendant committed the crimes. Nothing in the latter portion of the instruction about evaluating the minors' believability contradicted the former. Additionally, the trial court gave the full panoply of instructions on the presumption of innocence, the prosecution's burden, and evaluation of witness credibility.

10

11

12

13

Defendant claims that, because the instruction on witness credibility said the jurors could consider "anything" that tends to prove the truth of the testimony, the jury must have concluded they could use the CSAAS evidence to find the victims were truthful. However, jurors are routinely instructed to make fine distinctions about the purposes for which evidence is to be considered, and we presume jurors are capable of understanding and following the instructions. (<u>People v. Yeoman</u> (2003) 31 Cal.4th 93, 139 (<u>Yeoman</u>).)

14

There was no instructional error.

15

Lodged Doc. 10 at 16-17.

16

D. <u>Objective Reasonableness Under § 2254(d)</u>

17

To the extent this claim was resolved as a matter of state law, it cannot support federal

18

habeas relief for the reasons previously explained.  Moreover, as a matter of federal due process,

19

the CSAAS instruction must be evaluated in the context of the instructions as a whole and in light

20

of the entire trial record.  <u>Estelle</u>, 502 U.S. at 72.  When so viewed, there is little reason to believe

21

that the jury might have applied the instruction in a way that violated petitioner's constitutional

22

rights related to the presumption of innocence and prosecutor's burden of proof.  <u>See id.</u> at 72-73;

23

<u>Donnelly</u>, 416 U.S. at 643.  The jury was correctly instructed on the presumption of innocence

24

and prosecutor's burden of proof.  CT 202.  Nothing about the evidence, arguments, or instruction

25

in this case supports an inference that the jury would have misapplied the CSAAS-specific

26

instruction to override those clear principles.  Neither is there any reason to believe that the jury

27

would have taken CALCRIM 226's general invitation to consider all credibility-related factors as

28

permission to disregard the specific instruction related to CSAAS evidence.

20

1    The state court evaluated the challenged instruction in context, as due process requires.

2    Its rejection of petitioner's argument involved no objectively unreasonable application of federal

3    law.  Indeed, there is no U.S. Supreme Court precedent finding that similar jury instructions

4    offend due process.  Accordingly, petitioner cannot prevail under AEDPA standards.  See Wright,

5    552 U.S. at 125-26.

6        III.    Claim Three: Prosecutorial Misconduct in Closing Argument

7            A.  Petitioner's Allegations and Pertinent State Court Record

8    Petitioner alleges that the prosecutor violated due process by arguing in closing that

9    "same-sex child sexual abuse was something that a homosexual would do."  ECF No. 1 at 8.  He

10   contends that this argument impermissibly stigmatized him on the basis of his sexual orientation.

11   The record reflects the following.  Defense counsel argued in summation that petitioner's

12   possession of pornography and sex toys was irrelevant because petitioner was a gay man in a

13   consensual relationship with an adult partner, and those items were related only to that

14   relationship.  4 RT 865.  The prosecutor addressed the argument in rebuttal, as follows:

15
16   > And the defendant's a gay person.  I could care less whether he's
     > homosexual, heterosexual, does not matter to me.  The only reason
     > the fact that he's a homosexual matters is because the acts that he did
17   > is something that a homosexual would do.

18   > If he was heterosexual, I guarantee the defense would get up and say,
     > there's no way that he would allow a man to orally copulate him.  He
19   > has a girlfriend.  If he was heterosexual, I guarantee that the defense
     > would say, there's no way he would allow another man to put his
20   > penis up his anus because he is heterosexual.  So the things that these
     > boys are alleging that he did to them is not beyond what Mr. Chapa
21   > is interested in.

22   4 RT 936.

23           B.  The Clearly Established Federal Law

24   In reviewing prosecutorial misconduct claims, "[t]he relevant question is whether the

25   prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a

26   denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations

27   omitted).  "To constitute a due process violation, the prosecutorial misconduct must be of

28   sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer v.

21

1    <u>Miller</u>, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged

2    prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  <u>Smith</u>

3    <u>v. Phillips</u>, 455 U.S. 209, 219 (1982).  "[I]t is not enough that the prosecutors' remarks were

4    undesirable or even universally condemned."  <u>Darden</u>, 477 U.S. at 181.

5              C.  <u>The State Court's Ruling</u>

6         The opinion of the California Court of Appeal constitutes the last reasoned decision on the

7    merits, and is therefore the subject of habeas review in this court.  <u>See</u> <u>Ortiz</u>, 704 F.3d at 1034.

8    The Court of Appeal ruled as follows:

9              Defendant claims the prosecutor committed misconduct by arguing
10             to the jury that the charged offenses were "something that a
               homosexual would do," which supposedly inflamed prejudice
11             against homosexuals by playing on an unfounded stereotype that
               homosexuals are predatory child molesters.  Defendant did not object
12             in the trial court but on appeal cites the Standards of Judicial
               Administration imposing on the trial court a duty to prohibit
13             courtroom participants from engaging in conduct that exhibits bias
               based on sexual orientation.  Assuming defendant did not forfeit the
14             contention by failing to object in the trial court, it lacks merit because
               the prosecutor never said anything that could be viewed as an
15             insinuation that homosexuals are child molesters.

16             A prosecutor who uses deceptive or reprehensible methods to
               persuade the jury has committed misconduct. (<u>People v. Hill</u>, supra,
17             17 Cal.4th at p. 819.)  Where a claim of misconduct is based on the
               prosecutor's arguments to the jury, the question is whether there is a
18             reasonable likelihood the jury construed or applied the remarks in an
               objectionable fashion. (<u>People v. Smithey</u> (1999) 20 Cal.4th 936,
19             960.)

20             In his initial argument to the jury, the prosecutor made no reference
               to sexual orientation, other than to argue that, had the minors
21             fabricated the allegations as revenge for being cut off from gifts, the
               victims would have accused defendant's "partner," Richard Comer,
22             because it was Comer who had the money and shut off the phone.

23             Defense counsel argued to the jury that defendant "is not like
               everyone.  He's a gay man.  He lives with his partner and his elderly
24             mother.  In their bedroom, he and his partner had pornographic
               DVDs, adults that engage in sexual acts.  These are legal.  They were
25             gay adults engaged in consensual acts, also legal.  They had sexual
               aids that they kept in the bedroom, also legal.  Their consensual
26             sexual interest, though, could be described as nontraditional, and still
               [defendant] is not a sex offender.  [¶]  He's a generous man.  That's
27             what we learned.  He seems to have attracted a partner that is also a
               generous man.  You saw Rick [Comer] wheeling [defendant's]
28             mother into the courtroom.  And I'll call Rick a generous man
               because he is still caring for [defendant's] mother.  That's what they

are, they're both generous, and they seem to have become attracted to each other.  What you learned was that was decades ago.  They've been together for a very long time."  Defense counsel also said Comer was "standing by his man . . . ."

In rebuttal, the prosecutor argued to the jury:

"And the defendant's a gay person.  I could care less whether he's homosexual, heterosexual, does not matter to me.  The only reason the fact that he's a homosexual matters is because the acts that he did is something that a homosexual would do. [¶]  If he was heterosexual, I guarantee the defense would get up and say, there's no way that he would allow a man to orally copulate him.  He has a girlfriend.  If he was heterosexual, I guarantee that the defense would say, there's no way he would allow another man to put his penis up his anus because he is heterosexual.  So the things that these boys are alleging that he did to them is not beyond what [defendant] is interested in.

"Second, regarding the grooming, I don't care that he had sex toys.  I don't care that he had gay porn.  When we all start to care when you are showing those sex toys to a child.  He had no reason to show those sex toys to Jeremy.  The only reason that you are showing those sex toys to a child and explaining how they work is because you're grooming them.  You want them to feel comfortable with those sex toys.  You want them to feel comfortable with that kind of sex. [¶]  The gay porn, it is true that Jeremy saw it.  He asked what it was, and [defendant] said, it's gay porn.  Don't look at it.  That's fine.  But then why did he put it in an easily accessible place right after that Jeremy had access to?  If he really didn't want Jeremy to see it, why didn't he close the door and hide it?  But Jeremy said, no, he had it easily accessible. [¶]  What did Detective Lawrie say?  When I came into that room, there they were.  I saw the gay porn videos.  Why are you keeping them easily accessible?  Is that part of the grooming?"

Contrary to defendant's claim, the prosecutor's argument did not invite the jury to infer guilt based on an unfounded stereotype that homosexuals are likely to molest children. Defendant cites ancient inapposite case law where the People claimed homosexuality predisposes a person to molest children.  (People v. Giani (1956) 145 Cal.App.2d 539.)  Defendant also cites out-of-state cases that evidence of a defendant's homosexuality is inadmissible to establish propensity to engage in sex with children. (E.g., State v. Blomquist (Kan. App. 2008) 39 Kan. App.2d 101.) That did not happen in this case.

There was no prosecutorial misconduct.

Lodged Doc. 10 at 19-21.

### D.  Objective Unreasonableness Under § 2254(d)

The undersigned is considerably less sanguine than the California Court of Appeal about the prosecutor's statements that "the acts that [petitioner] did [with the boys] is something that a

23

1     homosexual would do" and that "the things that these boys are alleging that he did to them is not

2     beyond what [petitioner] is interested in" as a gay man.  Sex acts with male children are indeed

3     well "beyond" what gay men are interested *as gay men*, just as sex acts with female children are

4     "beyond" what heterosexual men are interested in as heterosexual men.  Adult sexual orientation

5     and behaviors are entirely different things than the proclivity to sexually abuse children of any

6     gender.  The state court's attempt to explain the prosecutor's statements as something other than

7     homophobic stereotyping is unpersuasive.  The prosecutor here created a straw man in the form

8     of a hypothetical defense argument, in the hypothetical case of a hypothetical heterosexual male

9     molester of boys, and then attempted to rebut that completely imaginary argument with the

10     purported consistency between adult gay sex acts and male-on-male child sexual abuse.  These

11     statements, particularly when taken out of context, are indeed offensive.  The prosecutor should

12     not have made them.

13         The clearly established law of due process, however, precludes evaluation of the

14     statements in isolation.  To the contrary, the offending statements must be assessed in the context

15     of the argument as a whole, and of the trial as a whole.  <u>Darden</u>, 477 U.S. at 179.  As always in

16     the due process context, the question is one of the trial's fundamental fairness.  Despite the

17     offending statements in closing argument, the case was not tried on the theory that defendant's

18     homosexuality made him a child molester.  Petitioner's relationship with Comer was presented

19     matter-of-factly and without anti-gay animus or disrespect.  The prosecutor emphasized that the

20     defendant's sexual orientation was irrelevant to his guilt.  The two brief remarks in rebuttal,

21     although inconsistent with the irrelevance of orientation, are unlikely to have affected the jury in

22     light of the evidence, arguments, and instructions as a whole.

23         In any event, the state court's failure to find fundamental unfairness cannot be considered

24     an objectively unreasonable application of clearly established federal law.  The U.S. Supreme

25     Court has found equally offensive—or even more offensive—statements not to violate due

26     process.  In <u>Darden v. Wainwright</u> itself, the prosecutors in a death penalty trial referred to the

27     African-American defendant in rebuttal as an "animal," argued at the guilt phase that only a death

28     sentence would prevent further crimes, and made emotional pleas to the jury that the Supreme

1   Court did not hesitate to call "offensive."  477 U.S. at 179-180.  The Court nonetheless affirmed

2   the conviction.  The misconduct presented here was less extensive.

3        For these reasons, the state court's resolution of the due process issue was not

4   unreasonable, and § 2254(d) therefore bars relief.

5       IV.    Claim Four: Due Process Was Violated by the Admission of Evidence That Petitioner

6               Possessed Homosexual Pornography and Sex Toys

7           A.  Petitioner's Allegations and Pertinent State Court Record

8        The jury learned that petitioner possessed pornographic videos depicting sex acts between

9   adult men, and dildos.  There was no evidence that he had shown the pornographic videos or the

10   sex toys to the victims, let alone used or attempted to use them with the victims.  Petitioner

11   contends that the evidence of his possession of these items was irrelevant, inflammatory, and

12   prejudicial in violation of due process.

13           B.  The Clearly Established Federal Law

14        The erroneous admission of evidence violates due process only if the evidence is so

15   irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v.

16   McGuire, 502 U.S. 62 (1991).  Otherwise, evidentiary ruling are matters of state law that do not

17   support federal habeas relief.  Id. at 67-68; see also Pulley v. Harris, 465 U.S. 37 (1984).  The

18   Supreme Court has rejected the argument that due process necessarily requires the exclusion of

19   prejudicial or unreliable evidence.  See Spencer v. Texas, 385 U.S. 554, 563-564 (1967); Perry v.

20   New Hampshire, 565 U.S. 228, 245 (2012); see also Holley v. Yarborough, 568 F.3d 1091, 1101

21   (9th Cir. 2009) (noting that the Supreme Court has never held that the admission of any type of

22   evidence violates due process).

23           C.  The State Court's Ruling

24        The opinion of the California Court of Appeal constitutes the last reasoned decision on the

25   merits, and is therefore the subject of habeas review in this court.  See Ortiz, 704 F.3d at 1034.

26   The California Court of Appeal ruled as follows:

27             Defendant contends the trial court erred by permitting evidence that

28             he possessed sex toys and homosexual pornography.  We disagree.

Relevant evidence means evidence having any tendency in reason to prove or disprove any disputed fact of consequence to the determination of the action. (Evid. Code, § 210.)  A trial court's ruling that evidence is relevant and not more prejudicial than probative (Evid. Code, § 352) is reviewed for abuse of discretion. (People v. Panah (2005) 35 Cal.4th 395, 474; People v. Harris (1998) 60 Cal.App.4th 727, 736-737.)

Defendant moved in limine to exclude the items as irrelevant and more prejudicial than probative.  At an Evidence Code section 402 hearing, Jeremy testified consistent with his trial testimony (except he said at the hearing that defendant showed him how to use the sex toys, but in front of the jury said he did not recall defendant explaining how the toys worked).  The trial court noted there were no pictures on the DVD cases.  The court ruled the evidence more probative than prejudicial because defendant exposed a child to items of a sexual nature, making the child familiar with those items, and defendant's possession of the items was not illegal.

On appeal, defendant argues there was no evidence he used the toys with either boy and no evidence that Jeremy watched the videos, and the evidence did not speak to delayed disclosure. However, the relevance of the toys and DVDs did not depend on their being used or viewed, but on the child being exposed to the topic of sex, which could factor into the CSAAS categories of secrecy and accommodation. That defendant does not consider the evidence convincing does not matter.

Defendant argues the evidence of the toys and videos had little probative value because it came from the same complaining witness who accused defendant of molestation. However, evidence of the toys and videos also came from the law enforcement officer who discovered those items in the search of defendant's bedroom.

Defendant argues the evidence was "prejudicial" within the meaning of Evidence Code section 352 because it would tend to evoke an emotional bias having little effect on the issues (People v. Padilla (1995) 11 Cal.4th 891, 925, overruled on other grounds in People v. Hill (1998) 17 Cal.4th 800, 823), in people who retain negative stereotypes about homosexuals. However, defendant's sexual orientation was already part of the record, and the toys and videos were not used in any activities with the victims.  The evidence had no tendency to evoke emotional bias having little effect on the issues.

We conclude the trial court did not abuse its discretion in allowing evidence of the videos and toys.

Lodged Doc. 10 at 18-19.

D.  Objective Unreasonableness Under § 2254(d)

The state court's resolution of the issue under the California Evidence Code is not reviewable here, and must be accepted as a correct conclusion of California law.  Estelle, 502

26

1   U.S. at 67-68; Bradshaw, 546 U.S. at 76.

2   　　　Petitioner's due process claim cannot clear the high bar erected by AEDPA.  In Holley v.

3   Yarborough, supra, the Ninth Circuit denied a due process claim based on the introduction at a

4   child sex abuse trial of evidence that petitioner possessed lewd and sexually explicit materials, as

5   well as weapons.  See Holley, 568 F.3d at 1996.  The claim was summarily rejected for lack of

6   governing U.S. Supreme Court precedent.  Id. at 1101.  Absent a Supreme Court case on point,

7   there can be no unreasonable application of clearly established federal law within the meaning of

8   §2254(d).  Wright v. Van Patten, 552 U.S. at 125-26.  Here as in Holley, therefore, federal habeas

9   relief is precluded regardless of the correctness of the evidentiary ruling.

10   　　V.　　Claim Five: The Jury Instruction Regarding Consciousness of Guilt Violated Due

11   　　　　　Process

12   　　　　　A.　Petitioner's Allegations and Pertinent State Court Record

13   　　　The jury was instructed pursuant to CALCRIM 371 as follows:

14   　　　　　If the defendant tried to hide evidence or discourage someone from
     　　　　　testifying against him, that conduct may show that he was aware of
15   　　　　　his guilt. If you conclude that the defendant made such an attempt, it
     　　　　　is up to you to decide its meaning and importance. However,
16   　　　　　evidence of such an attempt cannot prove guilt by itself.

17   CT 208.

18   　　　Petitioner contends that this instruction established a permissive inference that violates

19   due process under Ulster County Court v. Allen, 442 U.S. 140, 157 (1979).  Specifically,

20   petitioner argues that the instructions was inappropriate because there was no evidence that he

21   had authorized Comer to solicit Manuel's recantation, and a permissive inference of

22   consciousness of guilt cannot be based on the unauthorized actions of a third party.

23   　　　　　B.　The Clearly Established Federal Law

24   　　　Instructional error violates due process only where the infirm instruction so infects the

25   entire trial that the resulting conviction violates due process.  Estelle v. McGuire, 502 U.S. 62, 72

26   (1991) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  It must be established not merely

27   that the instruction is undesirable, erroneous, or even universally condemned, but that it violated

28   some constitutional right.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  The challenged

1    instruction may not be judged in artificial isolation, but must be considered in the context of the

2    instructions as a whole and the trial record overall.  Estelle, 502 U.S. at 72.  Moreover, relief is

3    only available if there is a reasonable likelihood that the jury has applied the challenged

4    instruction in a way that violates the Constitution.  Id. at 72-73.

5           In Ulster County Court v. Allen, supra, the Supreme Court addressed the constitutionality

6    of a state statute which provided that, with certain exceptions, the presence of a firearm in an

7    automobile was presumptive evidence of its illegal possession by all persons then occupying the

8    vehicle.  The appellants contended that absent application of this presumption, the evidence at

9    their trial was insufficient to support their convictions.  Ulster County, 442 U.S. at 148.  In

10   reviewing the distinction between permissive and mandatory presumptions, the Court explained

11   permissive presumptions as follows:

> The most common evidentiary device is the entirely permissive inference or presumption, which allows -- but does not require -- the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. See, e. g., Barnes v. United States, supra, at 840 n. 3. In that situation the basic fact may constitute prima facie evidence of the elemental fact. See, e. g., Turner v. United States, 396 U.S. 398, 402 n. 2. When reviewing this type of device, the Court has required the party challenging it to demonstrate its invalidity as applied to him. E. g., Barnes v. United States, supra, at 845; Turner v. United States, supra, at 419-424. See also United States v. Gainey, 380 U.S. 63, 67-68, 69-70. Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.

23   Ulster County, 442 U.S. at 157.

24          C.  The State Court's Ruling

25          The opinion of the California Court of Appeal constitutes the last reasoned decision on the

26   merits, and is therefore the subject of habeas review in this court.  See Ortiz, 704 F.3d at 1034.

27   The Court of Appeals resolved this issue as follows:

28   ////

28

Defendant contends the instruction about attempts to hide evidence as reflecting consciousness of guilt was unsupported by the evidence and contained an unconstitutional permissive inference. We disagree.

The trial court instructed the jury with CALCRIM No. 371: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

The trial court gave the instruction because of the evidence that defendant told each of the victims not to tell anyone about the sexual contact.

Defendant argues "hide evidence" in CALCRIM No. 371 means "hide physical evidence," because testimonial evidence is covered under the alternative phrase about discouraging someone from testifying, and the latter means only testifying at trial and therefore does not apply to telling victims not to report the crime. Defendant cites inapposite authority distinguishing between the crime of dissuading "testimony," meaning testifying in court, and the crime of dissuading someone from reporting a crime. (People v. Fernandez (2003) 106 Cal.App.4th 943, 948-950.) Fernandez is not authority for the proposition that "hide evidence" in CALCRIM No. 371 means only "hide physical evidence."

But, even assuming for the sake of argument that "hide evidence" means "hide physical evidence" and further assuming the court erred in instructing with CALCRIM No. 371, it was harmless. "[A]t worst, there was no evidence to support the instruction and . . . it was superfluous. . . . [E]vidence of defendant's guilt was strong. Under the circumstances, reversal on such a minor, tangential point is not warranted." (People v. Pride (1992) 3 Cal.4th 195, 249.)

Defendant argues the jury may have misapplied CALCRIM No. 371, because the prosecutor suggested in closing arguments that Comer may have cleared out defendant's computer before the police seized it, and Comer pressured Manuel to write the retraction letter. Defendant argues such misapplication of the instruction would constitute an unconstitutional permissive inference. However, the prosecutor did not argue these items as consciousness of guilt, but to counteract the defense theory that the retraction letter meant Manuel lied in accusing defendant, and that the absence of child pornography on the computer showed defendant did not fit the profile of a child molester. Moreover, the jury would not have misapplied the instruction to impute Comer's actions to defendant, because the instruction on its face was clearly limited to acts by defendant, and there was no evidence or argument that defendant committed these acts or even requested or authorized Comer to do so. (Yeoman, supra, 31 Cal.4th at p.139 [we presume the jury followed the instructions].)

29

We conclude defendant fails to show grounds for reversal.

Lodged Doc. 10 at 22-23

D. Objective Unreasonableness Under § 2254(d)

The state court reasonably found that the challenged instruction had been given not to address Comer's solicitation of a recantation from Manuel, but to address the testimony that petitioner had told both boys not to tell anyone about the ongoing sexual activity. The state court also reasonably found that the jury would not likely have misapplied the instruction to the testimony about Comer's involvement in Manuel's recantation. These findings may not be disturbed because they are not objectively unreasonable, and they undercut the premise of petitioner's argument under Ulster County—that a permissive inference of consciousness of guilt cannot be based on the unauthorized actions of a third party.

Moreover, Ulster County prohibits permissive inferences only under circumstances in which there is "no rational way the trier could make the connection permitted by the inference." 442 U.S. at 157. Here the factual predicate for the inference was the complaining witnesses' testimony that petitioner had told them not to tell anyone else about the sexual activity. The instruction clearly told the jurors that whether to infer consciousness of guilt, and the meaning and importance of such consciousness of guilt, was up to them. The jury was also instructed that an inference of consciousness of guilt was not sufficient, without more, to support a conviction. Accordingly, the prosecutor's burden of proof was unimpaired and the trial was not rendered fundamentally unfair.

The U.S. Supreme Court has never held that a permissive inference instruction regarding consciousness of guilt violates due process. Accordingly, this court lacks authority to grant relief. See Wright, 552 U.S. at 125-26. Because the state court's rejection of this claim was not objectively unreasonable under Ulster County or any other Supreme Court precedent, the claim fails.

VI.    Claim Six: Ineffective Assistance of Trial Counsel

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his Sixth Amendment right to the effective assistance of counsel

30

1   was violated by his lawyer's failures to (1) object and request admonition when the prosecutor

2   argued that same-sex child sexual abuse is something that homosexuals are interested in and that

3   a gay man would do; (2) object to or request modification of CALCRIM 1193 to the extent it

4   permitted consideration of CSAAS evidence in the evaluation of witness credibility; (3) object to

5   Dr. Urquiza's testimony regarding the frequency of false sexual abuse reports and the

6   phenomenon of "grooming."

7                B.   The Clearly Established Federal Law

8            To establish a constitutional violation based on ineffective assistance of counsel, a

9   petitioner must show (1) that counsel's representation fell below an objective standard of

10   reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland

11   Washington, 466 U.S. 668, 692, 694 (1984).  The proper measure of attorney performance is

12   objective reasonableness under prevailing professional norms.  Id. at 688.  Prejudice means that

13   the error actually had an adverse effect on the defense and that there is a reasonable probability

14   that, but for counsel's errors, the result of the proceeding would have been different.  Id. at 693-

15   94.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

16   Id.

17                C.   Exhaustion of State Court Remedies

18            Before seeking federal habeas review, a petitioner must present his claims to the state

19   courts and exhaust the remedies available there.  28 U.S.C. § 2254(b); see also Granberry v.

20   Greer, 481 U.S. 129, 131 (1987).  Respondent contends that petitioner's ineffective assistance

21   claim is unexhausted.  ECF No. 11 at 35.  However, petitioner sought review of a Sixth

22   Amendment ineffective assistance of counsel claim in the California Supreme Court, based on the

23   same acts and omissions identified here.  See Lodged Doc. 11 (Petition for Review) at 24-26.  By

24   fairly presenting the factual and legal basis of his federal claim to the state's highest court,

25   petitioner satisfied the requirement that he exhaust state court remedies.  See Baldwin v. Reese,

26   541 U.S. 27, 29 (2004); Wooten v. Kirkland, 540 F.3d 1019, 1025 (9th Cir. 2008); cert. denied,

27   556 U.S. 1285 (2009).

28   ////

1       While the California Court of Appeal did not substantively address the issue of ineffective

2   assistance of counsel in its opinion, petitioner did include the issue in his appeal.  See Lodged

3   Doc. 7 (Appellant's Opening Brief) at 101-107.[4]  It does not matter that the state court failed to

4   address or even consider the claim, because petitioner presented the claim and thus provided a

5   fair opportunity for it to do so.  Smith v. Digmon, 434 U.S. 332, 333-34 (1978) (per curiam).

6   Petitioner's ineffective assistance of counsel claim is therefore exhausted.

7           D.   The State Court's Ruling

8       Because the California Supreme Court denied review without comment or citation, the

9   denial of the claim was on the merits.  Harrington v. Richter, 562 U.S. 86, 99 (2011); see also

10  Johnson v. Williams, 568 U.S. 289, 298-301 (2013).  There is no reasoned decision of a lower

11  state court addressing this claim.

12          E.   Objective Unreasonableness Under § 2254(d)

13      Because the state court denied the claim on the merits but without explanation, this court

14  must determine whether there is any objectively reasonable basis for a denial under clearly

15  established federal law.  Richter, 562 U.S. at 102.  A Strickland claim may be denied on either

16  performance or prejudice grounds; a reviewing court need not address both prongs of the analysis

17  if it finds petitioner's showing insufficient as to one of them.  Strickland, 466 U.S. at 697.  For the

18  reasons that follow, the undersigned concludes that the California Supreme Court could have

19  reasonably denied the claim for lack of prejudice.

20      Renewed objection at trial to Dr. Urquiza's testimony would not have succeeded in

21  excluding the testimony, as it is broadly admissible under California law for the reasons explained

22  by the California Court of Appeal and not inconsistent with due process for the reasons explained

23  above.  Although there would have been merit in a specific objection to the testimony about false

24  accusation rates, and the undersigned agrees that this testimony should not have been allowed,

25  there is no reasonable likelihood that its exclusion would have affected the verdict.

26

27  [4]  The court merely noted that petitioner had claimed ineffective assistance of counsel "[i]nsofar
    as [he] failed to raise some of these points in the trial court."  Lodged Doc. 10 at 2.  There was no
28  further discussion of the issue.

1   Defense counsel's failure to challenge the jury instruction regarding proper consideration

2   of the CSAAS testimony would have been futile, as the instruction was a proper statement of

3   California law.  Despite counsel's arguable failure to preserve the issue, it was considered on

4   appeal.

5   Finally, counsel's failure to object to the prosecutor's homophobic remarks during rebuttal

6   argument could not reasonably be considered prejudicial.  Objections might have drawn more

7   attention to the offending remarks.  And even if the judge had sustained an objection, and

8   admonished the jury not to assume that petitioner's homosexuality predisposed him to being a

9   child molester, there is little likelihood of a different verdict.  The fact remains that there was

10  ample evidence against petitioner, the trial was not unfair overall, and none of counsel's alleged

11  errors cast doubt on the result or prevented appellate consideration of a meritorious issue.

12  Accordingly, the state court's silent rejection of this claim was not objectively unreasonable and

13  federal habeas relief is unavailable.

14  CONCLUSION

15  For all the reasons explained above, the state courts' denial of petitioner's claims was not

16  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

17  HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

18  These findings and recommendations are submitted to the United States District Judge

19  assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

20  after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

23  he shall also address whether a certificate of appealability should issue and, if so, why and as to

24  which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

25  within fourteen days after service of the objections.  The parties are advised that failure to file

26  ////

27  ////

28  ////

33

1    objections within the specified time may waive the right to appeal the District Court's order.

2    Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3    DATED: September 22, 2020

4    _____
     ALLISON CLAIRE

5    UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28